## STATE v. CLING ASHE.

(Filed 19 December, 1928.)

**1. Abduction—Elements of Crime—Adultery—Husband and Wife.**

The provisions of C. S., 4225, making it a felony for any male person to abduct or elope with the wife of another, has as an essential element adultery after the elopement.

**2. Abduction—Evidence—Circumstantial Evidence.**

In a prosecution under C. S., 4225, for the abduction of another's wife, the necessary element of adultery may be shown by circumstantial evidence which satisfies the jury of the defendant's guilt beyond a reasonable doubt.

**3. Same—Nonsuit.**

Evidence tending to show that the defendant charged with the violation of C. S., 4225, knew of the whereabouts of the wife of another after she had left her husband, and that they had dined together at a house of ill fame, and that they had shut themselves in a room thereof is competent upon the question of the abduction and of their immoral relations and a circumstance to be submitted to the jury.

**4. Same—Instructions.**

Where the evidence upon the trial of one charged with violating C. S., 4225, is that the defendant and the married woman met in a bad house, it is not prejudicial or reversible error for the judge in the statement of facts in his instructions to call it a "bad" house or "house of ill fame," where this was not brought to his attention at the time.

STATE *v.* ASHE..

**5. Trial—Instructions—Objections and Exceptions.**

An inadvertent error in the recitation of a fact in evidence by the court in his charge to the jury should be called to his attention at the time by the excepting party.

APPEAL by defendant from *Moore, J.,* and a jury, at July Term, 1928, of HAYWOOD. No error.

It was in evidence, on the part of the State, that the defendant was working in the mountains, logging with skidders, for Boice Hardwood Company. To carry on his work he had a shanty for his workmen. The prosecuting witness, Jesse Haynes, and his wife worked for defendant, Jesse Haynes peeling tan bark and his wife cooking for five or six of the workmen and defendant, and was paid by defendant. She ran the boarding house for defendant about eight months. Haynes and his wife had been married nearly four years and had two children. Defendant slept in the next shanty to defendant and his wife; that Jesse Haynes and his wife lived together and were getting along all right until defendant came and lived in the shanty; that while the hands and the husband were away during the day at their work, defendant was seen about the kitchen with Haynes' wife; that defendant gave Haynes' wife money, clothes, stockings, etc., at small cost. Haynes testified: "I was not at home when my wife left me. I don't know who she left with. I had already drawed up an idea where she was; when I heard Cling Ashe's car was at the top of the mountain I knew where the woman was. I found her at Sylva. I took out papers for Mr. Ashe. I withdrew those papers. In pursuance of my taking out those papers, I had several conversations with Cling Ashe. He told me where my wife was. He told me if I would withdraw the papers and wouldn't have him prosecuted he would show me the woman. He took me and showed me the woman. The first time I went to Sylva I had seen suspicion of wrong that had been committed between my wife and Mr. Ashe, but had not seen— did not know anything definite. . . . My wife stated to me in the presence of Cling Ashe that she wasn't going to live with me any more. When she made that statement Cling said she could stay with him as long as she wanted to. . . . Their acts and appearance made me think they had improper relations. That was all they could talk about; they seemed more perfect man and wife than me and her. . . . I was not jealous of my wife. Not a bit. I think she was a virtuous woman till the time we took the camp. After we took the camp I think she lost her virtue. I lived with her eight months after I thought that, but I thought I could save my kids and home and get it stopped. I thought my wife was having sexual intercourse with this man for eight months, and I put up with her. . . . I couldn't say who took her to Sylva. I didn't see anybody take her, but Mr. Ashe showed her to

me. He said, 'You are a damned fool for coming and searching my house after I ran away with the woman; you ought to know I wouldn't have the woman here after running away with her.' Ashe told me that my wife come with him in his car from the Boice works to Waynesville."

It was in evidence that after Haynes' wife left, that defendant visited her frequently at different places; that he rode around in a car with her and others. It was in evidence that Haynes' wife was an innocent and virtuous woman. The mother of Jesse Haynes' wife, Mrs. Joe Pressnell, testified: "Saw her and Cling Ashe in the room together prior to the time she left. I saw them standing in the kitchen together. She told me she was going to leave." After her daughter left her husband, Mrs. Pressnell had a conversation with defendant: "He said I was trying to lay all the blame on him, and I asked him what he would do if it was his daughter and some old man was to come along and take her off? I said, supposing Joe Pressnell was to come and take Jim Whitehouse's wife, what would he do? I said he would be in for shooting his brains out. He didn't say anything."

There were other circumstances. The defendant's defense was largely that he was a married man, fifty-eight years old, and that he was befriending the young woman, and that he had never at any time done anything inconsistent with this attitude. The woman herself testified along this line, and that she left her husband because he was mean to her. Both testified that there were no improper relations between them.

The material assignments of error and other necessary evidence will be set forth in the opinion.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*J. W. Ferguson, John M. Queen and Hannah & Hannah for defendant.*

CLARKSON, J. Defendant was indicted for abduction of Mrs. Jesse Haynes, a married woman, under C. S., 4225, which is as follows: "If any male person shall abduct or elope with the wife of another, he shall be guilty of a felony, and upon conviction shall be imprisoned not less than one year nor more than ten years: *Provided,* that the woman, since her marriage, has been an innocent and virtuous woman; *provided further,* that no conviction shall be had upon the unsupported testimony of any such married woman." *S. v. O'Higgins,* 178 N. C., 708; *S. v. Hopper,* 186 N. C., 405.

One of the essential elements of the offense after the elopement is adultery.

"Evidence of a crime may be circumstantial as well as direct. Prostitution is an offense usually committed in secret, and sometimes circumstantial evidence is the only kind that can be obtained. It is sufficient to show facts and circumstances from which the jury may reasonably infer guilt of the parties. *S. v. Eliason,* 91 N. C., 564. From the facts and circumstances, it is a substantial right that the jury must be satisfied of the guilt of the defendant beyond a reasonable doubt. *S. v. Palmore,* 189 N. C., 538." *S. v. Sinodis,* 189 N. C., at p. 567; *S. v. Poteet,* 30 N. C., 23; *S. v. Austin,* 108 N. C., 780; *S. v. Chaney,* 110 N. C., 507. We think the charge of the court below gave defendant the humane rule that the jury must be satisfied of his guilt beyond a reasonable doubt.

It is competent, as a circumstance, to prove that the persons charged with having committed the offense visited places which afforded them an opportunity for the commission of the unlawful act, and in such cases evidence is admissible to show the reputation of the place. *Sutton v. State,* 124 Ga., 815; 53 S. E., 381; *Commonwealth v. Gray,* 129 Mass., 474; *S. v. Cushing,* 86 Vermont, 416, 85 Atl., 770; *Wilson v. State,* 61 Tex. Cr. App., 628, 136 S. W., 447; *Davidson v. State,* 76 Tex. Cr., 196, 173 S. W., 1037; Wigmore on Evidence (2d ed.), sec. 78; *Sparks v. State,* 59 Ala., 82; *State v. Brunell,* 29 Wis., 435; *Whitlock v. State,* 4 Ind. App., 432, 30 N. E., 934; *State v. Price,* 115 Mo. App., 656, 92 S. W., 174; *State v. Hendricks,* 15 Mont., 194, 39 Pac., 93, 48 Am. St. Rep., 665. See Michigan Law Review, December, 1928, page 216. Some of the above decisions admit evidence solely of the general reputation of the house.

We think the material exceptions and assignments of error were to evidence obtained by the State from witnesses examined in behalf of the State to the effect that the *character of Ruth Owen,* at whose house the defendant and Mrs. Jesse Haynes visited, *was bad,* and that the general reputation of Ruth Owen's *house was bad.* That after defendant was bound over to court he visited Mrs. Jesse Haynes at Ruth Owen's house, carrying with him quite a bunch of groceries; that they fixed and had dinner pretty soon. They all ate around the table, some five to six people. After the dinner, defendant and the Haynes woman went into a room. This circumstance was explained by defendant by saying "that Ruth Owen (who was Mrs. McElroy), and Mr. McElroy himself, who was sick and lying on a bed, were in the room at that time."

The court below, in reciting the evidence, said: "One witness, Mr. Leatherwood, testified he saw her at Ruth Owen's here in town, which has been testified to by the witnesses to be a house of ill fame or bad character; that he saw this woman there at Ruth Owen's and saw the

defendant, Cling Ashe, go there carrying something like provisions and groceries; that they had dinner, and afterwards Cling Ashe and the woman went off in a room and shut the door." Under the facts in this case, taken in connection with the other circumstances, this circumstance was relevant—the weight was for the jury.

It may be inferred that "bad" meant "ill fame." If that was not the meaning as understood at the time, when the court below so construed it to mean "a house of ill fame or bad character," the defendant had an opportunity to correct the recital of fact, but did not do so. He cannot be heard now. *S. v. Geurukus,* 195 N. C., 642. There was no request to limit the evidence.

Then, again, "bad" is a general word. *"To the bad,* to a bad condition, implying, variously, illness (in a person), a deficit (in an account), *moral ruin,* etc."  Webster's Dictionary.

It may be noted that defendant does not make the exceptions and assignments of error to the charge in accordance with the rule laid down in *Rawls v. Lupton,* 193 N. C., 428.

We think there was sufficient evidence to be submitted to the jury and, in the charge, as a whole, there was no prejudicial or reversible error.

No error.